Lockwood, Justice, delivered the following separate opinion: I concur in the conclusion at which this court has arrived, that the judgment of the court below ought to be affirmed ; but as I do not in the views and reasoning upon which that conclusion is based, I deem it proper to give my own reasons for affirming the judgment. The indictment alleges, in substance, that Julia, a woman of color, by the laws of Kentucky and Louisiana, owes service to Sarah W. Liles, who resides in the state of Louisiana, and that while the said Sarah W. Liles was travelling from Kentucky to Louisiana, with her said slave, the said slave escaped secretly from her said mistress; all of which the defendant knew, but did unlawfully secrete the said Julia. The defendant demurred to the indictment, which being overruled by the court, he stood by his demurrer, and thereupon the court below entered a fine against him. [* 473] It is evident that the state’s attorney, in framing his indictment, did not proceed on the ground that Julia was a fugitive slave escaping from a slave state, and fleeing into this state ; for the facts stated- in the indictment show that she was brought into this state by her mistress. It is evident that this case does not come within the provisions of the constitution and law of the United States on the. subject of fugitives from labor. This position is fully sustained by most respectable and unexceptionable authorities. In the case of Butler v. Hopper, 1 Wash. C. C. R. 449, it was held by Justice Washington, in terms, that the provision of the constitution relative to fugitive slaves does not extend to the case of a slave carried voluntarily by his master into another state, and there leaving him under some law declaring him free. In a more recent case, ew parte Simmons, 4 Wash. C. C. R. 396, which was an application for a certificate to take a slave out of the state of Pennsylvania, under the 3d section of the act of February 12th, 1793, in relation to fugitives from justice and labor, the same eminent judge more directly decided the same point, holding that both the constitution and laws of the United States apply only to fugitives escaping from one state, and fleeing to another, and not to the case of a slave voluntarily brought by his master into such state. In the case now under consideration it has been elaborately argued by the counsel for the plaintiff in error, that the 149th section of the criminal code of this state violates the constitution of the United States, and the act of congress relative to fugitives from justice and labor. Applying the doctrine of the above authorities to the facts of this case, as set forth in the indictment, and it clearly follows that that question does not arise in this case. That every person in this state, without any regard to the color of his skin, is presumed to be free, admits of no doubt. This doctrine was fully laid down and sustained by this court in the cases of Bailey v. Cromwell et al. 3 Scam. 73; Cook v. Kinney, 3 Scam. 233. Julia then was not a fugitive from labor, under the constitution, of the United States and the law of congress, and being brought into this state by her mistress, where the presumption is in favor of her freedom, the question arises what takes her case out of the operation of this general rule ? The answer is that her ease is taken out of the operation of the general rule by the law of comity, by that law established by common consent among civilized nations or states, which binds them to sustain the institutions and laws of each other, under certain restrictions. The extent and force of this law of [* 474] comity is to be ascertained and determined by the courts. The legislature seldom or never undertakes to declare how far the laws of other nations shall be recognised and carried into effect. Judge Story, in his Conflict of Laws, page 25, in considering how the rule as to foreign laws is to be promulgated, whether it should be done by the legislature or the judicial power, says: “ In England and America the courts of justice have hitherto exercised the same authority (that is the authority in question) in the most ample manner; and the legislature has in no instance (it is believed) in either country^ interfered to provide any positive regulations. The common law of both countries has been expanded to meet the exigencies of the times as they have arisen; and so far as the practice of nations and the jus gentium privatum ' has been supposed to furnish any general principle, it has been followed out with a wise and manly liberality.” So also Chief Justice Parker, in Blanchard v. Russell, 13 Mass. 6, says: "As the laws of foreign countries are not admitted exproprio vigore but only sx commitate, the judicial power will exercise a discretion with respect to the laws they may be called upon to sanction; for if they should be manifestly unjust, or calculated to injure their own citizens, they ought to be rejected.” The same doctrine was substantially laid down by Lord Stowell in 2 Haggard 54. From these authorities the conclusion follows, that the courts of this state have the power independent of legislature enactment, rmder the law of comity, and in the exercise of a sound discretion, of determining what laws of other states shall be recognised and enforced in this. Is the case presented in the record of such a character as to appeal to tbe sound discretion of this court to enforce tbe laws and institutions of a sister state? In answering this question regard should be bad to tbe geographical position of Illinois, as well as to tbe relations we sustain to our sister states, confederated under the same general government. First. In geographical position Illinois is situated between the states of Kentucky and Missouri, and by the laws of both these two latter states slavery is permitted. The directed route of travel by land between these two states lies through the state of Illinois. The intercourse between many other of the slave states and Missouri, when carried on by land, must necessarily be through the state of Illinois. The state of Missouri has been populated principally by emigrants from Kentucky and other states. For upwards of thirty years past these emigrants,' with their slaves, have been permitted, without objection, to pass through this state. While this free passage through the state; with their slaves, recog-nised as property in the states whence they emigrated, has been of great convenience to the slaveholding states, it has not been without its advantages to our own state. Being of mutual advantage it has been permitted for more than thirty years past. If permitted for the future, the like advantages [*475] will continue to our own state, and the same convenience to our sister states. If the courts of this state, however, should decide that the owner of slaves was not protected under this law of comity, while passing through this state, the result would be that the emigrant with slaves could not pass through our borders. It needs no argument to prove that this privilege of passing through our state, either for business or pleasure, with their slaves, is a very great convenience to oür sister states, and if, after having permitted them this privilege for the last thirty years, we were now to deny it, could they not justly charge us with having availed ourselves of our local position to do them a serious and unnecessary injury ? If the owner of slaves emigrating through this state, without objection on our part, is not protected under this law of comity, it follows that all the slaves who have passed through this state to Missouri are free, and consequently unjustly held in bondage. The facts growing out of our geographical position, the past relations subsisting between this and neighboring states, the inconveniences to which we would subject them by a change of these relations, the loss of benefits to ourselves following a change of these relations, are such as appeal strongly to the discretion of this court. The relations we sustain to our sister states also furnish strong reasons why the law of comity should be expanded, so as to meet the exigencies arising out of that relation. What, then, are the relations we sustain to other states which ought to affect our pub-lie policy towards them? ■ They are not foreign states. We are bound up with them by the constitution of the United States into a Union, upon the preservation of which no one can doubt that our own peace and welfare greatly depend. Other nations may cherish friendly relations with each other, and endeavor to promote alliances and frequent intercourse, from fear of foreign war, or a desire of commercial prosperity. But to us these relations and this intercourse have a value and importance which are inestimable. They are the grounds of safety for our domestic peace, and for our hopes of the continuation of the happy government under which we live. ' Whatever injures one state injures the others. It is consequently our duty to consult the good of all the states, and so frame and administer our laws, that we give our sister states.no real cause of offence. We ought to do them all the kind offices in our power, consistently with our duty to ourselves. Thus will be produced that concord, that union of affection, and interest among the states, which may prove an enduring cement to that happy and glorious union, upon the continuation of which our hopes-of domestic peace and rational freedom so eminently depend. [*476] By the law of nations, it would be considered just cause of complaint, if we should arbitrarily refuse to the citizens of foreign nations at peace with us permission to pass through our territories, with their property. If this be so, as regards the citizens of foreign nations, how much greater propriety does there exist that we should extend this boon, if boon it be, to our fellow citizens, who are also our friends, our neighbors and our relations. That our denial to the people of our sister states to have the right of passage for themselves and their slaves would inflict on them a most serious injury cannot be doubted.’ The bitterness which usually characterizes border animosities admonishes us of the propriety of cultivating, by every just means in our power, that social intercourse with our neighbors which will be productive of mutual esteem and good will. Should we refuse them the privilege of taking their slaves through our state, would there not be danger that such refusal would engender feelings on their part not favorable-to a continuance of our happy Union? Am there reasons of sufficient magnitude to induce us to risk such consequences? I think not. Our interest, our duty, our love to our whole country, conspire to prove the propriety of allowing our fellow citizens of our sister states the right to travel through this state,’ either as emigrants or travelers, with their slaves, unless serious injury will result to ourselves by giving such permission. How injury can result to the people of this state, by-such a permission, I am entirely at a loss to conceive. On the contrary it might be shown, that, in many instances, it was to their decided advantage. It is, however, said that it is contrary to our policy to tolerate slavery. This objection is too broad. By the constitution and laws of the United States, the relation of master and slave is recognised as existing, and slaves escaping from their masters in a slave state, and fleeing to this, are to be surrendered up. By the act under which the defendant is indicted, and by numerous other acts, the relation of master and slave is fecognised. Slavery, then, to a limited extent, is sanctioned by our policy. But, in permitting emigrants and travelers the use of our highways, we do not thereby express any opinion upon the propriety of slavery. That question is still an open one, so far as it relates to its moral and political bearings. We simply determine that while the master and slave are peaceably passing through our state, we will so far recognise the relation, that we will not permit our citizens, during their transit, to interfere with that relation. In considering this question it may be well also to enquire what effect our refusal would have upon the slave himself. Would such refusal be injurious or beneficial to him ? It would not certainly tend in the slightest decree to emancipate him, nor would it lighten 1ns burdens. It would not prevent the master from emigrating or journeying. The master could still remove him to Missouri by taking a circuitous and tedious route [*477] to that state, without passing through our state, and merely subjecting the slave to a long and toilsome journey, probably on foot. Our refusal, then, would seriously injure the master, and not less seriously the slave. If, then, to grant to the citizens of ‘slaveholding states the right of passage through our state, with their slaves, will benefit both the master and the slave, and not injure us, what possible objection can there be to extending this privilege to them ? The 149th section of the criminal code, so far as it applies to harboring or secreting the slaves of citizens of our sister states, has implicitly sanctioned the law of comity, and by so doing the legislature has manifested a disposition to cultivate a spirit of harmony among the different members of the Union which it well becomes the courts of justice to imitate. Upon the whole I am of opinion that this section of the criminal code does not, when correctly construed and applied, trench upon the right of Congress exclusively to legislate upon the subject of fugitives from labor; and that, by comity, emigrants and travelers may pass through this state with their slaves, and every person who shall knowingly harbor and secrete any such slave, while in his transit, renders himself liable to the penalties of that statute. I am therefore of opinion that the judgment below should be affirmed. Wilson, Chief Justice, concurred in the opinion of Justice Lockwood, and Browne, Justice, was not present when the opinion was delivered. Judgment affirmed.